JOURNAL ENTRY AND OPINION
{¶ 1} Appellant, Cesar Simpson, appeals from a May 17, 2006 judgment of the Cuyahoga County Court of Common Pleas, finding him guilty of rape and kidnapping, and sentencing him to life in prison. For the following reasons, we affirm.
 {¶ 2} Simpson was indicted by the Cuyahoga County Grand Jury on January 25, 2006, on two counts: count one, rape, a violation of R.C.2907.02(A)(1)(b), with further specifications that Simpson used force, the victim was under the age of ten years old, and that serious physical harm resulted to the victim; and count two, *Page 3 
kidnapping, in violation of R.C. 2905.01(A)(2) and/or (A)(4), with a sexual motivation specification. Simpson entered a plea of not guilty to the charges.
 {¶ 3} A jury trial commenced on April 10, 2006. The state presented the following testimony.
 {¶ 4} Kenya Oliver-Porter ("Ms. Porter") testified that she is the mother of the minor victim, C.P., whose date of birth is January 10, 1996. C.P. was ten years old at the time of trial and nine years old on the date of the alleged incident on September 13, 2005. Ms. Porter is married to and lives with C.P.'s father, Charles Porter ("Mr. Porter"). They have two other minor children in the home, a six-year-old son and a thirteen-year-old daughter.
 {¶ 5} Ms. Porter testified that up until one month before the incident, she and her family lived next door to Simpson, his mother, Kelli Hobbs ("Ms. Hobbs"), and his younger brother. They were good neighbors and very good friends. The two families saw each other every day. Their children played together. Ms. Porter said that both of Ms. Hobbs' children were like sons to her and her husband.
 {¶ 6} Mr. Porter also testified that the families were very close and that he interacted with both Simpson and his younger brother on a daily basis. He said that he taught them how to play basketball. He helped Simpson with his homework and gave him advice about girls.
 {¶ 7} On Sunday, September 11, 2005, Ms. Hobbs dropped her two children off at the Porters for a few days because she had to go out of town on business. *Page 4 
Both Mr. and Mrs. Porter stated that Simpson and his brother were supposed to sleep on the couch during their stay.
 {¶ 8} C.P. testified that on the night of the incident, he went to bed around 9:00 p.m. Simpson was not in his bed when he went to sleep and he did not see him come into his room. The next time he saw Simpson was when "he was on me." C.P. further explained, "[l]ike I was like flat on my stomach. He was like on my back." When he woke up and saw Simpson, he said he felt pain on the "left side of his butt cheek." Simpson was "like going back and forth." When he found Simpson doing it to him, he pushed Simpson off.
 {¶ 9} When asked by the prosecutor whether Simpson was touching him with any of his body parts, C.P. replied no. But when further asked what was making his buttocks hurt, C.P. stated, "[w]hen he put his private part in my butt." He explained that "private part" meant "dick." He further agreed that "dick" meant "penis." He said that Simpson had never done that before.
 {¶ 10} C.P. went to the bathroom after he pushed Simpson off of him to put something on his buttocks because it was hurting; however, he could not remember what it was that he used. He knew that he was bleeding because he saw blood on his boxer shorts. After about ten or fifteen minutes, he went back to his bed. Simpson was still on his bed, but they did not say anything to one another. C.P. then went to sleep. *Page 5 
 {¶ 11} C.P. said that he did not tell his parents right away because they had been friends with Ms. Hobbs and her children since "before [he] was born." And he did not think that his parents would believe him.
 {¶ 12} When asked on cross-examination if it hurt when Simpson put his penis in his butt, C.P. said that it did. When further asked, "[d]id it hurt really bad[,]" C.P replied, "[n]ot that bad." When he went into the bathroom, he wiped his butt with toilet paper and there was blood on the paper. He said again that he could not remember exactly what he put on his butt to make it stop hurting, but he thought that it was probably a liquid, and not a solid. He got it out of the medicine cabinet and whatever it was, it made his butt stop hurting. He said that he could not remember seeing or hearing his sister come into to his room.
 {¶ 13} C.P.'s sister, however, testified that sometime in the middle of the night, she heard C.P. crying and went into his bedroom. She said that Simpson was supposed to sleep in the living room on the couch, but he was lying next to C.P. on his mattress. Simpson was awake. C.P.'s sister asked him why he was in C.P.'s bedroom and why C.P. was crying, but Simpson told her to go back to her room, so she did. She said that she heard C.P. crying again, so she went into his room for a second time. Simpson told her to go back to her room once more, and she did. She did not tell her parents because she did not think it was a big deal. C.P said that he went to school the morning after the incident, but did not stay all day. He went to see the school nurse because he felt bad that he did not tell his parents what *Page 6 
Simpson did to him. He lied to the school nurse and told her that he had a stomach ache so he could go home. He said that he did not feel "dirty" from what happened the night before, but he felt "mad and angry." He explained that his grandmother picked him up from school, and that when he got to her home, he told her what happened. He thought his grandmother would believe him more than his parents would.
 {¶ 14} C.P.'s grandmother, Barbara Torres ("Ms. Torres"), testified that she picked C.P. up from school on the morning of September 13, 2005. When they left the school, as they were walking to her car, C.P. said to her, "[w]ell, grandma, I didn't want to say it in school but Cesar put his dick in my butt." She said those were his exact words.
 {¶ 15} When they got back to her apartment, Ms. Torres said that C.P. wanted to take a shower because he felt dirty and "he said he was hurting." She explained that the boxer shorts that he had on were ripped "in the seat."
 {¶ 16} Ms. Torres stated that she did not call C.P.'s parents to tell them. She said she was going to tell his parents later, "but they were so friendly with [Ms. Hobbs and her children]." Ms. Torres said that her daughter (C.P.'s mother) called her when she got home after she had picked up the boys and asked her why she did not say anything. She said she should have, but she felt uncomfortable. *Page 7 
 {¶ 17} Both Mr. and Mrs. Porter testified that they picked C.P. and his brother up from their grandmother's house after work and that almost immediately, C.P.'s brother said that he had to tell them something. C.P.'s brother told his parents he heard C.P. tell their grandmother that Simpson had put his penis in C.P.'s butt. C.P. then told his parents, "[h]e stuck his dick in my ass." Mr. Porter asked C.P. if he was telling the truth. Mr. Porter said, "And my son looked me in my eyes and he said, `Dad, I'm telling you the truth.'" Mr. Porter testified that was all he needed to hear.
 {¶ 18} Mr. and Mrs. Porter drove from Ms. Torres' apartment to Ms. Hobbs' home. They told her what happened and confronted Simpson. Simpson denied that he had done anything to C.P., and kept repeating, "I didn't do it." Mr. Porter said that since Simpson did not "come clean," they went to the police station.
 {¶ 19} After they left the police station, they took C.P. to the hospital so that a rape kit examination could be done on him. The doctor told them that C.P.'s anus was torn. The doctor took a photograph of the tear and Mr. Porter identified the photograph in court.
 {¶ 20} Libbie Stansifer ("Dr. Stansifer"), a second-year pediatric resident at Rainbow Babies Children and Hospital, testified that she examined C.P. in the early morning hours on September 14, 2005. She performed the rape kit examination on him. She stated that C.P. had an approximately two-centimeter long laceration in his perianal region, which she explained was part of his anus; the area just outside the *Page 8 
rectum. It appeared to be a fresh laceration. She opined that whatever caused the tear, whether a penis or a hard object, would have to penetrate the anus in order to cause the tear.
 {¶ 21} Dr. Stansifer read from her report which she had written the night C.P. had come into the hospital. In it, she had written, "[t]he victim is unsure if [Simpson] ejaculated. He later complained to his parents of the incident. He also complained of anal bleeding after wiping following a bowel movement." She further read from her notes that, "[s]ome time between midnight and 6 a.m. the patient claims assailant attempted rectal penetration. Incomplete penetration." She explained that in her opinion, there was physical evidence of anal penetration, but incomplete evidence of rectal penetration. She also agreed on cross-examination that she could not give an opinion as to whether hard stool or constipation could have caused the anal laceration.
 {¶ 22} The state also presented Sally McHugh, an intake sexual abuse social worker for Cuyahoga County Department of Family and Children Services ("CCDFCS"). She investigated C.P.'s sexual abuse allegations against Simpson. She said that she has interviewed approximately 7,500 children regarding sexual abuse allegations.
 {¶ 23} In her interview with C.P., McHugh said that he was very nervous. She began by showing him anatomically detailed drawings so that she could understand what he called his own body parts, especially his "private areas." She described the *Page 9 
events as told to her by C.P. and his parents. After her investigation, she explained that she found C.P. to be credible and had knowledge of information that a child his age would not normally have. Thus, she concluded that sexual abuse was "indicated." She did not "substantiate" it, however, because she did not have the medical test results at the time of the evaluation.
 {¶ 24} David Niemeyer, a forensic scientist for the Ohio Bureau of Criminal Identification and Investigation, testified that he examined the evidence submitted to him in this case. The evidence consisted of a rape kit, a comforter, two blankets, and two pair of boxer shorts. He also had "known standards" submitted from Simpson and C.P., for DNA testing.
 {¶ 25} He reported that both pair of boxer shorts tested positive for blood. The comforter and one of the blankets tested positive for semen. Another blanket tested positive for semen and blood. He explained that after he finds that an item tests positive, he retains it in a freezer for DNA testing.
 {¶ 26} Russell Edelheit, a forensic scientist in the DNA section of the Ohio Bureau of Criminal Identification and Investigation, testified that the blood found on both pair of boxer shorts was C.P.'s blood. There was semen identified on the comforter and both blankets, but it did not match the DNA of Simpson or C.P. The semen identified on the blankets and comforter had a similar DNA profile as C.P.'s, and thus, would be consistent with that of a first degree relative of C.P. *Page 10 
 {¶ 27} The state's final witness was Susan Schmid ("Officer Schmid"), a detective with the Euclid Police Department. She was assigned to C.P.'s case on September 14, 2005. She witnessed McHugh interview C.P. behind a one-way mirror. She also observed C.P.'s in-court testimony and agreed that it was consistent with what he told McHugh in the interview. She collected evidence for the case, standards for the forensic testing, and interviewed C.P.'s other family members regarding the incident.
 {¶ 28} At the close of the state's case, Simpson moved the trial court for an acquittal pursuant to Crim.R. 29, which the court overruled.
 {¶ 29} Simpson presented his mother, Ms. Hobbs, as his only witness. Ms. Hobbs testified that she had an excellent relationship with the Porter's. They went on vacation together, shared food together, and watched each other's children. She stated that there had never been an allegation of sexual misconduct made against her son before.
 {¶ 30} Ms. Hobbs testified that Simpon's date of birth is August 19, 1987, and he was eighteen years old at the time of the alleged incident in September 2005. She said that he got good grades in school, was in the YO! Cleveland program, and had never had any problems with the law.
 {¶ 31} She also explained that Ms. Torres had told her previously that C.P. had been touching his younger brother's penis. After that, when the Porter's still lived next to her, she was at their home watching a movie. She had gone to the bathroom *Page 11 
and saw in one of the bedroom's, C.P. on top of his younger brother on a bed, under the sheets. She did not say anything, however, to the Porter's about what she saw. She explained that she continued to allow her children to spend the night at the Porter's home because her children were older and she was not worried about them being there.
 {¶ 32} Simpson rested his case and renewed his Crim.R. 29 motion, which the trial court overruled. Prior to the case going to the jury, the state and Simpson agreed to add the lesser included offense of attempted rape. After deliberation, the jury found Simpson guilty of rape, and furthermore, found that the victim was under the age of ten years old and that Simpson used force while committing the offense. The jury did not find that Simpson's actions resulted in serious physical harm to the victim, but did find Simpson guilty of kidnapping with the sexual motivation specification.
 {¶ 33} On May 17, 2006, the trial court sentenced Simpson to life in prison on the rape conviction with the possibility of parole after fifteen years, and three years on the kidnapping conviction, to be served concurrently with each other. The trial court also informed Simpson that he would be subjected to ten years of post-release control and found him to be a sexually oriented offender. *Page 12 
 {¶ 34} It is from this judgment that appellant appealed, raising the following eight assignments of error:
 {¶ 35} "[1.] Appellant's conviction for forcible rape is based on insufficient evidence where the state of Ohio failed to offer any evidence of force.
 {¶ 36} "[2.] The evidence presented at trial was insufficient to sustain a conviction for rape, were [sic] the state failed to present sufficient evidence of penetration.
 {¶ 37} "[3.] Appellant's conviction for rape and the attendant force specification are against the manifest weight of the evidence.
 {¶ 38} "[4.] The trial court erred in not holding a hearing on defense counsel's motion to withdraw.
 {¶ 39} "[5.] The trial court erred in not allowing trial counsel to withdrawal [sic] from his representation of the appellant.
 {¶ 40} "[6.] The trial court erred in permitting witnesses to bolster the credibility of the alleged victim.
 {¶ 41} "[7.] Trial counsel was ineffective when he failed to meaningfully challenge the state's case through the adversarial system.
 {¶ 42} "[8.] The imposition of life imprisonment violates substantive due process and constitutes cruel and unusual punishment."
 SUFFICIENCY OF THE EVIDENCE *Page 13 {¶ 43} In his first and second assignments of error, Simpson argues that the evidence was insufficient to convict him of rape beyond a reasonable doubt. For the following reasons, we disagree.
 {¶ 44} Sufficiency of the evidence is the legal standard which is applied to determine whether the evidence is legally sufficient to support a jury verdict as a matter of law. State v. Thompkins (1997),78 Ohio St.3d 380, 386. Legal sufficiency is a test of adequacy and is a question of law. Id., citing State v. Robinson (1955), 162 Ohio St. 486. When determining sufficiency of the evidence, we must consider whether, after viewing the probative evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense proven beyond a reasonable doubt. State v.Shaffer, 11th Dist. No. 2002-P-0133, 2004-Ohio-336, at _17.
 {¶ 45} In his first sufficiency argument, Simpson maintains that there was no evidence of force or threat of force submitted beyond that inherent in the commission of sexual conduct. Thus, he requests the force specification be vacated and the matter remanded for a new sentencing hearing.
 {¶ 46} Simpson was convicted of R.C. 2907.02(A)(1)(b), which provides, "[n]o person shall engage in sexual conduct with another * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." *Page 14 
 {¶ 47} R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and a female; anal intercourse, fellatio, and cunnilingus between persons, regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."
 {¶ 48} Force is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C.2901.01(A)(1). Additionally, the force need not be overt and physically brutal to accomplish its objective; i.e., the force and violence necessary under the code depend upon the age, size, and strength of the parties and their relationship to one another. State v. Eskridge (1988),38 Ohio St.3d 56, 58.
 {¶ 49} In State v. Sullivan (Oct. 7, 1993), 8th Dist. No. 63818, 1993 Ohio App. LEXIS 4859, at 9-10, the victim, just prior to her thirteenth birthday, went to the home of her aunt and Sullivan to babysit the couple's child. The victim went to sleep on a mat on the floor of the baby's room at around 11:00 p.m. She awoke approximately one to two hours later, finding Sullivan between her legs, licking her vagina. The victim's underwear and shorts were pulled down and her legs were pulled apart. Sullivan was convicted of rape, which he appealed. He argued that the state's evidence failed to support the element of force. This court affirmed, reasoning: *Page 15 
 {¶ 50} "It is readily apparent that the element of force was established through the testimony of the victim in two separate manners. First, the separating of Kathleen's legs and the pulling down of her shorts and [underwear] clearly can only be accomplished by the application of physical force. These acts, although not of the same degree as a blow or continuous restraint, are without question within the definition of `force'. The word `any' specified in the definition of `force' recognizes that various crimes upon various victims require different degrees and manners of force. In the instant case, the victim was a young girl who was initially asleep; therefore, the force the defendant needed * * * required only minimal physical exertion." Id. at 9-10.
 {¶ 51} Similarly, in State v. Lillard (May 23, 1996), 8th Dist. No. 69242, 1996 Ohio App. LEXIS 2150, the sixteen-year-old victim was asleep when she awoke to find the defendant looking into her vagina with a flashlight. We compared the facts to Sullivan, and reasoned, "[t]his evidence, when viewed in a light most favorable to the prosecution, would allow a rational trier of fact to infer that appellant used physical exertion to position [the victim's] robe and legs to allow the examination. The state, therefore, provided sufficient evidence regarding the element of force or threat of force." Lillard at 15-16.
 {¶ 52} Viewing the evidence in a light most favorable to the prosecution in the case sub judice, we conclude that a rational trier of fact could have found the state proved the essential element of force beyond a reasonable doubt. Specifically, any *Page 16 
rational trier of fact could have found that eighteen-year-old Simpson exercised force over nine-year-old C.P., who was initially sleeping, by manipulating his clothing and sleeping body into a position that facilitated the sexual conduct. This physical manipulation required force, however minimal, beyond that inherent in the act of anal rapeitself.
 {¶ 53} In his second sufficiency argument, Simpson claims that there was insufficient evidence of penetration to convict him of rape. He maintains that a conviction of "anal rape" requires proof of penetration of the victim's anus, not just his buttocks. Simpson argues that C.P.'s "only certainty" was that his buttocks was penetrated. We disagree.
 {¶ 54} A rational trier of fact could find sufficient evidence of penetration. C.P. did not just testify that Simpson penetrated his buttocks, as argued. He repeatedly stated at trial, and as indicated by his grandmother, parents, Dr. Stansifer, and McHugh, that Simpson put his penis in his butt, not that Simpson touched his buttocks with his penis. In addition, although Dr. Stansifer testified that she was not certain of rectal penetration, she was certain of anal penetration. "Penetration, however slight, is sufficient to complete * * * anal intercourse." R.C. 2907.01(A). Thus, there was sufficient evidence of penetration to convict Simpson of rape beyond a reasonable doubt.
 {¶ 55} Accordingly, Simpon's first and second assignments of error are overruled. *Page 17 
 MANIFEST WEIGHT OF THE EVIDENCE {¶ 56} In his third assignment of error, Simpson argues that his conviction of forcible rape was against the manifest weight of the evidence.
 {¶ 57} Although a judgment of a trial court is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the weight of the evidence. Thompkins, supra, at 387, citingRobinson, supra, at 487. Sitting as the "thirteenth juror," in a manifest weight argument, an appellate court reviews the entire record, weighs the evidence and all the reasonable inferences, considers the credibility of the witnesses, and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id.
 {¶ 58} Simpson claims that C.P.'s testimony "is simply incredible and unbelievable" and that at trial, Simpson presented a more credible alternative to what happened to C.P. He asserts that C.P. penetrated himself with his finger and likely caused the injury to himself. This argument is wholly without merit.
 {¶ 59} After reviewing the entire record, weighing all the evidence, making reasonable inferences, considering the credibility of the witnesses, and determining whether the jury clearly lost its way, we conclude the evidence overwhelmingly showed that Simpson committed the act. As we indicated previously, C.P. testified that he was sleeping when he awoke to find Simpson on top of him, and that *Page 18 
Simpson "put his private part in my butt" and was "like going back and forth." C.P. said that his buttocks hurt after Simpson did that, so he went into the bathroom and applied some medicine. C.P.'s sisters testified that she saw Simpson in C.P.'s room that night, on two occasions. C.P. told his grandmother first, and then told the same story to his parents, Dr. Stansifer, and McHugh. C.P.'s version of what happened was consistent throughout his trial testimony, as well as when he was recalling it to others who then testified to it at trial. In addition, there was medical evidence of anal penetration, an anal laceration, and blood on two pair of C.P.'s boxer shorts.
 {¶ 60} Simpson also argues that since C.P. continued to sleep with Simpson when he returned from the bathroom, that it shows that he is not believable. We disagree. Several witnesses testified to the closeness of the families and the fact that Simpson was like an older brother to C.P. Many victims continue to love or respect their abusers even after the abuse has occurred, sometimes over periods of many years. Thus, it was not so "incredible" that C.P. would continue to sleep with Simpson after this one incident and not be afraid of him.
 {¶ 61} Therefore, Simpson's third assignment of error is overruled.TRIAL COUNSEL'S MOTION TO WITHDRAW
 {¶ 62} In his fourth and fifth assignments of error, Simpson argues that the trial court erred when it did not hold a hearing on his trial counsel's motion to withdraw, *Page 19 
and when it did not allow his trial counsel to withdraw.[1] Since these assignments of error are interrelated, we will consider them concomitantly.
 {¶ 63} It is well settled that a withdrawal motion is within the sound discretion of the trial court. State v. Edgell (1972),30 Ohio St.2d 103, 111. A reviewing court should not reverse the decision of the trial court in the absence of an abuse of that discretion. Abuse of discretion commonly is described as more than a mere error of law or judgment. It implies that the trial court's attitude is arbitrary, unreasonable or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 64} Simpson relies upon State v. Deal (1969), 17 Ohio St.2d 17, in support of his argument that the trial court should have held a hearing to inquire into the reasons submitted by his trial counsel in the motion to withdraw. In Deal, the Ohio Supreme Court held that where anindigent defendant questions the effectiveness and adequacy ofassigned counsel, the trial court has a duty to inquire into the complaint and make it part of the record. Id. at syllabus.
 {¶ 65} In Deal, at the close of the state's case, the defendant made a "specific, not vague or general" and a "timely" objection to his attorney's representation. Id. at 19. He complained that his attorney did not file notice of an alibi defense or *Page 20 
subpoena the witness necessary for this defense. Id. at 18. The trial court did not inquire into the defendant's complaints. To prevent defendants "from being deprived of review on the matter," the Supreme Court imposed an affirmative duty upon the trial court to inquire, on the record, into a defendant's complaints regarding the adequacy of his appointed counsel. Id. For the reasons that follow, Deal is not applicable here.
 {¶ 66} In State v. Hibbler, 2d Dist. No. 2001-CA-43, 2002-Ohio-4464, at _14, the Second District stated:
 {¶ 67} "In the wake of Deal, Ohio's appellate courts have reversed convictions when trial courts fail to make on-the-record inquiries into specific objections about the performance of court-appointed counsel. Notably, however, courts have read Deal as imposing on a defendant the initial burden of articulating specific concerns about his appointed counsel. Absent specific objections to counsel's performance, the trial court has no duty to investigate anything. * * *" (Emphasis added.)
 {¶ 68} In the case at bar, Simpson's trial counsel filed a motion to withdraw as attorney of record on March 20, 2006, ten days prior to Simpson's scheduled trial for rape of a child less than ten years old and kidnapping. Simpson's trial counsel served Simpson with the motion, along with a letter to Simpson and his mother, advising Simpson to "immediately call the Public Defender's Office * * * for the purpose of securing counsel." *Page 21 
 {¶ 69} In the motion, Simpson's trial counsel set forth the reasons he requested to withdraw. He asserted that after "a number of pretrial discussions with the State," he strongly advised Simpson to consider a plea agreement that would subject him to an agreed minimum sentence. Simpson, however, was "adamant in his refusal" and demanded a trial. Defense counsel claimed that Simpson was "engaging in conduct that [was] contrary to the judgment and advice of counsel[,]" which made it "difficult for counsel to provide Defendant with effective assistance as guaranteed by the Sixth Amendment[.]"
 {¶ 70} Simpson did not file a response to the motion or raise any complaints or objections to the trial court — before, during, or after the trial — that he was dissatisfied with his trial counsel's effectiveness or adequacy of representation. Thus, the trial court did not abuse its discretion by not holding a hearing, since it did not have a duty to inquire in this case.
 {¶ 71} Simpson further argues that the trial court should have allowed his trial counsel to withdraw because counsel set forth mandatory reasons for the withdrawal. We disagree.
 {¶ 72} Simpson claims that his trial counsel set forth mandatory reasons for withdrawal under DR 2-110(B).[2] After reviewing this disciplinary rule, the only *Page 22 
provision that could possibly apply is DR 2-110(B)(4); i.e., a lawyer shall withdraw if the lawyer "[i]s discharged by the client."
 {¶ 73} In his motion, Simpson's trial counsel alleged that he had been "constructively discharged" by Simpson. However, simply because a defendant refuses to accept a plea against his attorney's advice, and instead, wishes to exercise his constitutional right to go to trial, does not mean the defendant "discharged" the attorney. In fact, there isnothing in the record to show that Simpson wanted to end the relationship or was not satisfied with his trial counsel's representation. Thus, Simpson's trial counsel did not allege a mandatory reason for withdrawal.
 {¶ 74} Simpson's trial counsel did allege a permissive reason for withdrawal under DR 2-110(C)(1)(d); i.e., the client "[b]y other conduct renders it unreasonably difficult for the lawyer to carry out his or her employment effectively." The alleged "conduct" given by Simpson's trial counsel was that Simpson was making "it unreasonably difficult for counsel to provide Defendant with effective assistance" *Page 23 
because he was listening to the "advice [of] a non-lawyer" to go to trial, rather than accept the plea.
 {¶ 75} In State v. Kelly (Aug. 22, 2000), 10th Dist. No. 99AP-1302, 2000 Ohio App. LEXIS 3785, the asserted conflict was that defense counsel had advised the defendant that he would likely lose at trial and should accept the state's offer of a plea bargain. The defendant, claiming he was innocent, refused to accept the plea. The court reasoned that an attorney has a duty to be candid with a client, not be optimistic when the facts do not warrant it and overruled the defendant's motion for removal of appointed counsel. Id. at 8. The court held that the purported "conflict" does not rise to the level that an attorney cannot render effective assistance.[3] Id.
 {¶ 76} Here, Simpson never expressed dissatisfaction with his trial counsel's representation. His trial counsel filed the motion ten days prior to trial, claiming a "conflict" existed. Simpson had a constitutional right to face his accusers and have the state prove its case against him. It is ultimately a defendant's right to go to trial or accept a plea. Thus, regardless of the reason Simpson decided to go to trial, it was his decision. This "conduct" did not justify his trial counsel's withdrawal ten days prior to trial. Accordingly, Simpson's fourth and fifth assignments of error are not well-taken.
 BOLSTERING THE CREDIBILITY OF VICTIM *Page 24 {¶ 77} In his sixth assignment of error, Simpson argues that the trial court erred when it permitted witnesses to bolster the credibility of the alleged victim. Specifically, Simpson claims that the trial court abused its discretion when it permitted McHugh to testify to C.P.'s credibility, since credibility is for the fact finder to determine. Simpson further asserts that McHugh was "allowed to simply reiterate the complaining witness' testimony."
 {¶ 78} The admission or exclusion of evidence rests within the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. State v. Hamilton, 8th Dist. No., 2006-Ohio-1949, at _19.
 {¶ 79} McHugh testified, without objection, as to what C.P. told her about the alleged abuse. After her investigation, she explained that she found that sexual abuse was "indicated." When asked by the prosecutor why she "indicated" abuse, she stated, "[t]alking to [C.P.], he gave a credible disclosure of what happened to him. He had knowledge of stuff that he wouldn't have necessarily had knowledge of at his age. At that time I didn't have any admission from a perpetrator, medical findings or witnesses, so that's why I indicated it [and did not substantiate it]."
 {¶ 80} We will first address McHugh's testimony "reiterating" C.P.'s statements about the abuse to her. There was no error in admitting this testimony. Victims' statements, made to social workers in the course of their investigation of an abuse allegation, are admissible. State v.Dyer, 8th Dist. No. 88202, 2007-Ohio- *Page 25 
1704, at _16, citing State v. Dines (Nov. 1, 1990), 8th Dist. No. 57661, 1990 Ohio App. LEXIS 4748 ("the testimony of a social worker who examines child victims of sexual abuse is an exception to the rule against hearsay pursuant to Evid.R. 803(4)").
 {¶ 81} Next, we will consider McHugh's statement regarding C.P.'s credibility. Simpson relies on State v. Boston (1989),46 Ohio St.3d 108, in support of this argument. In Boston, the Ohio Supreme Court addressed the issue of whether an expert witness may testify to the veracity of a child witness. The high court held at the syllabus, "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." The facts in the case were that a two and a half year old child was allegedly sexually abused by her father; the parents of the child were involved in a "bitter battle for custody." The child was found to be incompetent to testify as a witness, and the trial court admitted into evidence statements the child made to her mother, the treating pediatrician, and her counselor. The pediatrician testified that the victim "had not fantasized her abuse" and had not "been programmed to make accusations against her father." The high court stated that the doctor "in effect, declared that [the victim] was truthful in her statements." Id. at 128. In addition, the counselor, a specialist in child sexual abuse, testified at trial that the victim was telling the truth. *Page 26 
 {¶ 82} After examining the Rules of Evidence, the Ohio Supreme Court held that "we have little difficulty in finding that the admission of this testimony was not only improper — it was egregious, prejudicial and constitutes reversible error." Id. at 128. The Supreme Court further explained that "`[i]n our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses.'" Id. at 129, quotingState v. Eastham (1988), 39 Ohio St.3d 307. As a result of the evidential error, which the court found to be more than harmless error, the Ohio Supreme Court reversed and remanded the matter for a new trial. Id.
 {¶ 83} In the case sub judice, the state asked McHugh what her disposition of the sexual abuse allegation was, and she explained that she "indicated" abuse. The prosecutor asked why she came to that disposition.[4] McHugh testified that she found C.P. to be credible. Almost immediately, the trial court sua sponte interrupted the state's questioning at that point, concerned that McHugh was testifying to C.P's credibility. The state produced an Eighth District case, State v.Smelcer (1993), 89 Ohio App.3d 115, claiming it held that a social worker can testify to her disposition in a child sexual abuse case. Defense counsel read the case in court and agreed that McHugh could testify to the disposition. *Page 27 
 {¶ 84} We agree that Smelcer stands for the proposition that social workers can testify to their disposition in an alleged sexual abuse case. Id. at 121. However, Smelcer does not hold that a social worker can testify to the truthfulness or credibility of an alleged victim. In fact, in Smelcer, unlike the case here, this court noted that "the expert was not asked, nor did he express any opinion about [the victim's] veracity." Id.
 {¶ 85} Based upon our review of Boston and its progeny, we find that McHugh's testimony regarding her opinion as to C.P.'s credibility was improper. Nevertheless, this court has recognized that error in admitting such expert testimony may be harmless beyond a reasonable doubt. State v. Reid, 8th Dist. No. 83206, 2004-Ohio-2018, at _35;State v. Djuric, 8th Dist. No. 87745, 2007-Ohio-413, at _44. This conclusion is warranted if the victim testifies and is subject to cross examination, the state introduces substantial medical evidence of sexual abuse, and the expert's testimony is cumulative to other evidence.Reid at _35, citing State v. Kovac, 150 Ohio App.3d 676, 687,2002-Ohio-6784.[5]
 {¶ 86} In the case sub judice, there was significant independent medical evidence submitted in this case, as well as the testimony of other witnesses, *Page 28 
including the victim himself. C.P. took the stand and testified extensively, and more importantly, was subjected to cross-examination. The jury had a full opportunity to gauge his credibility. Thus, the expert's testimony was "cumulative to the other evidence." Therefore, we conclude that the error was harmless beyond a reasonable doubt. Accordingly, Simpson's sixth assignment of error is overruled.
 INEFFECTIVE ASSISTANCE OF COUNSEL {¶ 87} In his seventh assignment of error, Simpson argues he was denied the effective assistance of counsel because his trial counsel committed six critical errors during the course of the trial. Simpson argues that, without these errors, the outcome of the trial would have been different.
 {¶ 88} In a claim of ineffective assistance of counsel, the burden is on the defendant to establish that counsel's performance fell below an objective standard of reasonable representation and prejudiced the defense. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus; State v. Lytle (1976), 48 Ohio St.2d 391, vacated on other grounds (1978), 438 U.S. 910; and Strickland v. Washington (1984),466 U.S. 668. Therefore, to determine whether counsel was ineffective, Simspon must show both that (1) "counsel's performance was deficient," in that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment,"and (2) counsel's "deficient performance prejudiced the defense," in that "counsel's errors were so serious as to *Page 29 
deprive the defendant of a fair trial, a trial whose result is reliable." Strickland at 687.
 {¶ 89} Simpson first argues that his trial counsel was ineffective because he did not challenge the competency of C.P. This was a tactical decision. It is well established that trial tactic decisions do not constitute a deprivation of effective counsel. State v. Phillips (1995),74 Ohio St.3d 72, 85, certiorari denied (1996), 517 U.S. 1213. Moreover, this alleged error would not even meet the first test underStrickland; i.e., that counsel was deficient. Simpson himself concedes that under Evid.R. 601(A), children ten years or older are presumed competent to testify. Thus, Simpon has not demonstrated deficiency or ineffectiveness.
 {¶ 90} Second, he maintains that when the state concluded direct examination of each witness, defense counsel failed to ask to review the witnesses' statements. Crim. R. 16(B)(1)(g) provides, in part, as follows:
 {¶ 91} "Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement."
 {¶ 92} Simpson does not present one instance where he alleges inconsistencies were present, nor does he show how he was prejudiced by his trial counsel's failure to conduct in camera inspections. State v.Drummond, *Page 30 111 Ohio St.3d 14, 2006-Ohio-5084, at _210. Moreover, strategic decisions, even unsuccessful ones, do not, in general, constitute ineffective assistance of counsel. State v. Carter (1995), 72 Ohio St.3d 545, 558.
 {¶ 93} Third, Simpson asserts that his trial counsel sat back, without objection, as the state began to "elicit testimony" regarding Simpson's post-arrest silence. The question posed by the state to McHugh was, "[n]ow you talked to, again, [C.P.] and his parents. Did you speak with anyone else in connection with this case?" McHugh stated, "[b]esides Detective Sue Schmid, I did try to interview the alleged offender, Cesar Simpson, but upon the advice of his attorney, he re-[.]" At which point, the trial court immediately interrupted McHugh's answer and instructed the jury to "[disregard the last comment." There was nothing for Simpson's trial counsel to object to at that point. Even if there was, trial counsel's failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel.State v. Lockett (1976), 49 Ohio St.2d 48, paragraph nine of the syllabus.
 {¶ 94} Fourth, Simpson argues that his trial counsel "sat idle and allowed the state to elicit hearsay and allowed the state to bolster its case with the testimony of the social worker." We previously determined that C.P.'s statements to McHugh were admissible, and as such, it was not deficient for Simpson's counsel to not object. *Page 31 
 {¶ 95} Fifth, Simpson claims that his trial counsel was ineffective because he "failed to object to the dismissal of a juror who was seemingly friendly to the defense position and could not have been removed for cause by the state."
 {¶ 96} After voir dire, opening arguments and the testimony of one witness, a juror informed the judge that a former, seventeen-year-old babysitter for his children had accused him of sexual misconduct. After questioning by the judge, the juror said that he could follow the law and be impartial. The state, however, requested the juror be removed because the juror "was very reluctant to disclose anything about whether or not he was falsely accused." The state was concerned that the juror may have been holding something back. Simpson's trial counsel did not object to the state's request, and the juror was removed for cause.
 {¶ 97} Crim.R. 24(C) provides fourteen reasons a juror may be removed for cause. The fourteenth one is "[t]hat juror is otherwise unsuitable for any other cause to serve as a juror." It was within the trial court's discretion to remove the juror for cause under this provision.State v. Tenace, 109 Ohio St.3d 255, 2006-Ohio-2417, at _26. Moreover, Simpson does not show how he was prejudiced by the court's removal of this juror.
 {¶ 98} Finally, Simpson contends generally that his trial counsel failed to meaningfully challenge the state's case through the adversarial process. Simpson does not allege any specific instances, besides the ones we previously addressed, of *Page 32 
his counsel's failure to challenge the state or explain how he was prejudiced. Moreover, the record shows that Simpson's trial counsel actively defended Simpson throughout the trial.
 {¶ 99} Accordingly, Simpson's seventh assignment of error is overruled.
 MANDATED SENTENCE OF LIFE IN PRISON {¶ 100} In his eighth and final assignment of error, Simpson argues that the mandated life prison sentence that he received was disproportionate to the underlying conduct in this case, and as such, violates his substantive due process rights and constitutes cruel and unusual punishment as prohibited by the Eighth Amendment. For the following reason, we disagree.
 {¶ 101} R.C. 2907.02(B) provides that where an offender violates R.C.2907.02(A)(1)(b), and the victim is under the age of ten, the offender is subject to life imprisonment. Simpson contends that the life sentence is disproportionate to the crime allegedly committed.
 {¶ 102} "It is generally accepted that punishments which are prohibited by the Eighth Amendment are limited to torture or other barbarous punishments, degrading punishments unknown at common law, and punishments which are so disproportionate to the offense as to shock the moral sense of the community." McDougle v. Maxwell (1964),1 Ohio St.2d 68, 69. "As a general rule, a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment." Id. *Page 33 
 {¶ 103} The Second District Court of Appeals addressed this same argument in State v. McConnell, 2d Dist. No. 19993, 2004-Ohio-4263. The court held that the life sentence imposed upon McConnell for raping an eight-year old child, "in violation of R.C. 2907.02(A)(1)(b), does not constitute cruel and unusual punishment, because the life sentence is not disproportionate or shocking to the moral sense of the community, in view of the heinous nature of the crime." Id. at _142. We agree.
 {¶ 104} Thus, we conclude that Simpson's life sentence imposed for raping a nine-year-old child is not disproportionate or shocking to the moral sense of the community, considering the heinous nature of the crime.
 {¶ 105} Therefore, Simpson's eighth assignment of error is overruled.
 POST-RELEASE CONTROL {¶ 106} Finally, although not raised by Simpson, we sua sponte consider his sentence as it affects his substantial rights.[6] See Crim R. 52(B). At the sentencing hearing, the trial court informed Simpson, "when you come out [of prison], you will come out on Post Release Control, parole, for a period of up to 10 years." In the sentencing entry, the trial court stated, "defendant notified of possibility of post-release control of up to 10 years." The trial court's imposition of ten years of post-release control was plain error, and thus, we will address it. *Page 34 
Because Simpson was convicted of rape, a first degree felony that was a sex offense, and kidnapping, a first degree felony, he was subject to five years of mandatory post-release control. R.C. 2967.28(B)(1). Although unclear, because the trial court did not give its reasons, it appears that the trial court improperly sentenced Simpson to five years of post-release control for each first-degree felony. This was plain error.
 {¶ 107} R.C. 2967.28(B) provides that for first and second-degree felonies, felony sex offenses, and third-degree felonies which resulted in physical harm or the threat of physical harm, a period of post-release control is mandatory.
 {¶ 108} R.C. 2967.28(B)(1) further specifies that the period of mandatory post-release control shall be: (1) five years for first-degree felonies or felony sex offenses; (2) three years for second-degree felonies that are not sex offenses; and (3) three years for third degree felonies which resulted in physical harm or the threat of physical harm.
 {¶ 109} There is nothing in R.C. 2967.28 which permits a trial court to impose multiple periods of post-release control for each felony conviction. When offenders are convicted of multiple first-degree felonies, courts shall impose "a mandatory term" of post-release control, set forth in R.C. 2967.28(B)(1), not multiple terms. SeeState v. Bingham, 8th Dist. No. 88080, 2007-Ohio-1161, at _8. Thus, the post-release control imposed was contrary to law. *Page 35 
 {¶ 110} Under R.C. 2953.08(G)(2), an appellate court "may increase, reduce, or otherwise modify a sentence * * * or may vacate that sentence and remand the matter to the sentencing court for resentencing. * * * The appellate court may take any action authorized by this division if it clearly and convincingly finds * * * [t]hat the sentence is otherwise contrary to law."
 {¶ 111} Accordingly, we modify Simpson's sentence to include five years of mandatory post-release control. See State v. Leonard, 8th Dist. No. 88299, 2007-Ohio-3745 (this court sua sponte modified defendant's sentence when trial court improperly ordered defendant to serve five years of mandatory post-release control, when it should have been a mandatory three-year period).
 {¶ 112} In modifying Simpson's sentence, we are aware of the Ohio Supreme Court's recent decision, State v. Bezak, 114 Ohio St.3d 94,2007-Ohio-3250. In Bezak, the trial court informed the defendant at the sentencing hearing: "`[y]ou'll be out in the not too distant future, at that point you won't have a — probably will not be on post-release control given that it's a six-month sentence, but I can't guarantee that." The defendant, however, was subjected to mandatory post-release control. The Supreme Court held:
 {¶ 113} "When a defendant is convicted of or pleads guilty to one or more offenses and post[-]release control is not properly included in a sentence for a *Page 36 
particular offense, the sentence for that offense is void. The offender is entitled to a new sentencing hearing for that particular offense." Id. at syllabus.
 {¶ 114} The Supreme Court concluded that its decision in State v.Jordan, 104 Ohio St.3d 21, 2004-Ohio-6085, controlled in Bezak. InJordan, the Supreme Court held (1) when sentencing a felony offender to a term of imprisonment, the trial court is required to notify the offender at the sentencing hearing about post-release control, and incorporate the notice into its sentencing entry; and (2) because the trial court has a statutory duty under R.C. 2929.19(B)(3)(c) to provide notice of post-release control at the sentencing hearing, any sentence imposed without such notification is contrary to law, and the sentence must be vacated and remanded for resentencing. Id. at paragraphs one and two of the syllabus.
 {¶ 115} After reviewing Bezak and Jordan, we conclude that the case at bar is distinguishable, and thus, a new sentencing hearing is not required here. The trial court improperly informed Simpson that he would be subjected to ten years of post-release control, rather than five. Thus, Simpson was told that he would have to serve a "longer term" than the five years actually required. See State ex rel. Cruzado v.Zaleski, 111 Ohio St.3d 353, 2006-Ohio-5795, at _26 (writ of habeas corpus denied where trial court informed defendant at sentencing hearing that he would be subjected to five years of mandatory post-release control, when it was only three years). *Page 37 
 {¶ 116} As is Cruzado, although the trial court "misstated the post[-]release-control term" as ten years, the trial court "did provide some notice" that Simpson would be "subject to a multi-year term of post-release control." Id. The Supreme Court noted the goal of Am. Sub. S.B. No. 2 was "truth in sentencing," so that a defendant knows "the restrictions that have been imposed by the trial court on the defendant's personal liberty[;] * * * that his liberty would continue to be restrained after he served his sentence." Id. at 24. Simpson was well aware that his liberty would continue to be restrained, albeit five years longer than it should have been, after he served his sentence. Thus, we conclude that a new sentencing hearing is not required in these circumstances.
 {¶ 117} Moreover, since Bezak was decided, another appellate court has modified a defendant's period of post-release control, rather than vacate the sentence and remand for a new sentencing hearing. InState v. Rogers, 12th Dist. No. CA2006-09-036, 2007-Ohio-3720, the trial court imposed a "mandatory five-year period" for a third-degree felony, when it should have been "a discretionary period of up to three years of post-release control." The Rogers court modified the sentence to include the proper term of post-release control. Id. at _15.
 {¶ 118} Accordingly, Simpson's eight assignments of error are not well taken. The judgment of Cuyahoga County Court of Common Pleas is affirmed. *Page 38 
Simpson's sentence is modified with respect to his mandatory five years of post-release control.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANTHONY O. CALABRESE, JR., P.J., CONCURS. KENNETH A. ROCCO, J., CONCURS AND DISSENTS WITH SEPARATE CONCURRING AND DISSENTING OPINION.
[1] On March 20, 2006, Simpson's trial counsel moved to withdraw as attorney of record ten days prior to the scheduled trial. The trial court did not rule on this motion. Since the trial court did not rule on this motion, it has the effect of being denied. Charter One Bank v.Tutin, 8th Dist. No. 88081, 2007-Ohio-999, at _12.
[2] DR 2-110(B) — "Mandatory withdrawal. — A lawyer representing a client before a tribunal, with its permission if required by its rules, shall withdraw from employment, and a lawyer representing a client in other matters shall withdraw from employment if the lawyer:
(1) Knows or it is obvious that the client is bringing the legal action, conducting the
defense, or asserting a position in the litigation, or is otherwise having steps taken for the client, merely for the purpose of harassing or maliciously injuring any person.
(2) Knows or it is obvious that his or her continued employment will result in violation of a Disciplinary Rule.
(3) Has a mental or physical condition that renders it unreasonably difficult for the lawyer to carry out the employment effectively.
(4) Is discharged by the client."
[3] In this case, trial counsel was not appointed, but hired by Simpson.
[4] The prosecutor's questioning in this portion of the transcript indicates that the prosecutor was attempting to get McHugh to explain why she did not "substantiate" the abuse, rather than just "indicate" it. The prosecutor was not attempting to procure McHugh's opinion as to C.P.'s credibility.
[5] In Kovac, the Second District cautioned the state, however, `"that witnesses are not to offer opinions on the truthfulness of a victim's accusations.'" Id. at 1J43, quoting State v. Miller (Jan. 26, 2001), 2d Dist. No. 18102, 2001 Ohio App. LEXIS 230. It further warned, `"[t]he state elicits such testimony at its peril, particularly where the evidence essentially involves a credibility contest and significant independent evidence of the offenses * * * is lacking.'" Id.
[6] Simpson will be eligible for parole after fifteen years. Thus, the period of post-release control he will be subjected to significantly affects his substantial rights.