[Cite as *State v. Henry*, 2009-Ohio-3535.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                      CASE NO. 13-08-10

    v.

KIEL A. HENRY,                            O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 07-CR-0242

Judgment Reversed and Cause Remanded

Date of Decision:    July 20, 2009

APPEARANCES:

    *Javier H. Armengau* for Appellant

    *James A. Davey* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Kiel A. Henry, appeals the judgment of the Seneca County Court of Common Pleas convicting him of gross sexual imposition, sentencing him to five years of community control, and classifying him as a sexually oriented offender. On appeal, Henry asserts that his conviction was not supported by sufficient evidence; that the trial court erred when it denied his motions for acquittal and a new trial; and, that his conviction was against the manifest weight of the evidence. Based upon the following, we reverse the judgment of the trial court and remand the matter for further proceedings consistent with this opinion.

{¶2} In September 2007, the Seneca County Grand Jury indicted Henry for two counts of gross sexual imposition in violation of R.C. 2907.05(A)(1), felonies of the fourth degree. The indictment arose from an accusation that Henry, while intoxicated, went into a Heidelberg College campus residence, entered a sleeping woman's bedroom, got into her bed, and engaged in sexual contact with her.

{¶3} In January 2008, the case proceeded to trial, at which the following testimony was heard.

{¶4} The victim, K.C., testified that, on August 12, 2006, she was a student at Heidelberg College in Seneca County; that she lived in a campus house

commonly referred to as the "CDH house" with six other women who were members of the same community service society; that the society was having a "retreat" at the house and no men were present; that she went to bed around 12:30 a.m. wearing only shorts and a sports bra; that the shorts were approximately eight inches long with an elastic waistband; and, that her bedroom was located on the second floor of the house and her bed was situated against the wall.

{¶5}  K.C. continued that she was awakened during the night when she felt a man lying right behind her; that she was lying on her side, facing the wall; that she felt a hand underneath her shorts in her pubic area; that she initially thought the man was her boyfriend because she was sleepy; that she put her hand on his arm, removed it from her shorts, and said "no"; that her hand remained on his arm for the duration of the incident; that, for a second time, the man put his hand into her shorts and touched her vagina; that she again removed his hand and said "no"; that, for a third time, the man put his hand into her shorts and touched her vagina; that she again removed his hand and said "no"; that, for a fourth time, the man put his hand into her shorts, but this time penetrated her vagina with his finger; that she removed his hand again; that, for a fifth time, the man put his hand into her shorts, and, at that point, she "woke completely up" and realized that the man was not her boyfriend (trial tr., vol. II, p. 187); and, that she braced her feet against the wall and pushed the man off her bed and onto the floor, causing a loud thud.

{¶6} K.C. continued that she then jumped out of bed and ran out of the room, screaming to the other women in the house that there was a man in her room; that the other women ran up the stairs and went into the bedroom; that the man, later identified as Henry, was still lying in the same spot on the floor; and, that the women lifted him up to carry him out of the room because Henry was "not with it," but then he "came to" and eventually left the house. (Id. at 191). K.C. further testified that she did not even know Henry's name at the time of the incident; that she never gave Henry permission to come into her bedroom, get into her bed, or to touch her; and, that she had never been in a relationship with Henry or had physical relations with him.

{¶7} On cross-examination, K.C. testified that she did not lift up her shorts when Henry was touching her; that Henry did not make any verbal threats; that she did not make any efforts to scream or to get out of the bed until the fifth time that Henry touched her; that she was able to get out of the bed "as soon as [she] wanted to" (Id. at 207); that, once she pushed him off the bed and he landed on the floor, he did not move until the women dragged him out of the bedroom; that Henry was bigger, bulkier, and stronger than she was; and, that she told the police officers that he was "very, very wasted." (Id. at 209).

{¶8} Rachel Goodenow, K.C.'s housemate at the time of the incident, testified that, on the night of the incident, she attended the society retreat at the CDH house; that, after K.C. went upstairs to bed, seven or eight men from the

wrestling team arrived at the house; that some of the men were acquainted with some of the women in the house; that the men visited for approximately twenty to thirty minutes, and then departed, except for Henry; that Henry "small talked" with her and two other women on the first floor of the house; that, eventually, Henry either passed out or fell asleep; that she and the other women decided to walk him back to his apartment because they did not want him to sleep on their couch; that they left him alone on the couch for approximately four minutes; and, that when they returned, he was gone, and they assumed he had left.

{¶9}   Goodenow continued that, at some point thereafter, she heard a loud thud and K.C. came running down the stairs screaming; that K.C. was frantic, very distressed, and kept repeating "who the hell are you" and "get the f**k out" (Id. at 246); that she and the other women went up to K.C.'s bedroom and dragged Henry into the hallway; that he went into the bathroom where they heard him vomiting; and, that K.C. is very petite and Henry is a "larger wrestler."  (Id. at 249).

{¶10} Sergeant Mark E. Marquis, a police officer for the city of Tiffin, testified that he responded to an alleged sexual assault at the CDH house; that he located Henry walking down the street; that he asked Henry what had happened at the CDH house, and Henry advised that he had gone there with some friends after the bars closed, and that someone told him he needed to go to bed, so he went upstairs to go to bed.

**{¶11}** Officer Jacob Demonte of the Tiffin Police Department testified that he and Sergeant Marquis spoke to Henry, who was obviously intoxicated; that Henry advised that he was coming "from the bars," was "very intoxicated," and "felt like throwing up" (trial tr., vol. III, p. 282); that Henry admitted he had been at the CDH house; that Henry advised that "the last thing he remembered was falling asleep on the couch [at the CDH house] downstairs by himself" (Id. at 283); and, that when Sergeant Marquis asked Henry if he went upstairs at all, he responded that "yes, he had went [sic] upstairs. Someone had told him he could go to sleep, but he couldn't remember who. He went upstairs. Found a bed and laid [sic] down in bed and remembered going to sleep with no one else in the bed." (Id.)

**{¶12}** Detective Brian Bryant of the Tiffin Police Department testified that Henry was a "big wrestler" and at least twice the size of K.C. (Id. at 295); that he interviewed Henry approximately an hour and a half to two hours after the incident; that, at the time of the interview, he did not believe Henry was intoxicated, as he was coherent and talking; that he talked to K.C. about going to a hospital for an examination, but that she refused; and, that, where the allegation involves digital penetration, collection of DNA evidence must be done rather quickly, and, in this case, Henry had already washed his hands at least once.

{¶13} At the close of the State's evidence, Henry made a Crim.R. 29 motion for acquittal, arguing that the State failed to present sufficient evidence of sexual contact or force or threat of force, which the trial court overruled.

{¶14} Thereafter, the jury found Henry guilty of the first count of gross sexual imposition and not guilty of the second count of gross sexual imposition.

{¶15} In February 2008, Henry filed a motion for acquittal, or in the alternative, a motion for a new trial, which the trial court denied.

{¶16} In May 2008, the trial court sentenced Henry to community control for a period of five years. Additionally, the trial court classified Henry as a sexually oriented offender.

{¶17} It is from his conviction and sentence that Henry appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**APPELLANT'S CONVICTION FOR GROSS SEXUAL IMPOSITION WAS NOT SUPPORTED BY SUFFICIENT, CREDIBLE EVIDENCE AND THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DENYING APPELLANT'S RULE 29 MOTION FOR ACQUITTAL AND MOTION FOR A NEW TRIAL.**

*Assignment of Error No. II*

**APPELLANT'S CONVICTION FOR GROSS SEXUAL IMPOSITION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. I*

**{¶18}** In his first assignment of error, Henry argues that his conviction for gross sexual imposition was not supported by sufficient, credible evidence, and, consequently, that the trial court erred when it denied his motions for acquittal and for a new trial. Specifically, Henry contends that the evidence did not establish beyond a reasonable doubt that he engaged in sexual contact with K.C. because there was insufficient evidence to establish that the contact was for the purpose of sexual arousal or gratification. Additionally, Henry contends that there was insufficient evidence that he compelled K.C. to engage in such contact through the use of force or threat of force. We agree that there was insufficient evidence to establish that Henry compelled K.C. to engage in such contact through the use of force or threat of force.

**{¶19}** Under Crim.R. 29, a trial court, on a defendant's motion or its own motion, "after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Crim.R. 29(A). However, a trial court shall not order an entry of judgment of acquittal under Crim.R. 29(A) if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of an offense has been proven beyond a reasonable doubt. *State v.*

*Bridgeman* (1978), 55 Ohio St.2d 261. A motion for acquittal tests the sufficiency of the evidence. *State v. Miley* (1996), 114 Ohio App.3d 738, 742.

{¶20} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 392, 2005-Ohio-2282, citing *State v. Jenks* (1981), 61 Ohio St.3d 259, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355. Sufficiency is a test of adequacy, *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Robinson* (1955), 162 Ohio St. 486, superseded by state constitutional amendment on other grounds as stated in *Smith*, supra.

{¶21} R.C. 2907.05 governs gross sexual imposition and provides, in pertinent part:

> **No person shall have sexual contact with another, not the spouse of the offender[,] * * * when any of the following applies: (1) The offender purposely compels the other person * * * to submit by force or threat of force.**

R.C. 2907.05(A).

**{¶22}** For ease of discussion, we will analyze separately Henry's arguments concerning the sexual contact element and force or threat of force element of the gross sexual imposition statute.

### A.     Sexual Contact

**{¶23}** The Revised Code defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."  R.C. 2907.01(B).

**{¶24}** In determining a defendant's intent, this Court has held that "[t]he proper method is to permit the trier of fact 'to infer from the evidence presented at trial whether the purpose of the defendant was sexual arousal or gratification by his contact with those areas of the body described in R.C. 2907.01.  In making its decision the trier of fact may consider the type, nature and circumstances of the contact, along with the personality of the defendant.  From these facts the trier of facts may infer what the defendant's motivation was in making the physical contact with the victim.'" *State v. Huffman*, 3d Dist. No. 13-2000-40, 2001-Ohio-2221, quoting *In re Alexander*, 3d Dist. No. 9-98-19, 1998 WL 767457.  Additionally, "circumstantial evidence of intent is admissible to demonstrate the sexual contact element of gross sexual imposition."  Id., citing *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus.

{¶25} Here, Henry argues that there was insufficient evidence to establish that his contact with K.C. was for the purpose of sexual arousal or gratification. However, testimony was heard that Henry climbed into K.C.'s bed, lay down right behind her, and touched her vagina with his hand five times, one time penetrating her vagina with his finger. We conclude that sufficient circumstantial evidence existed for a jury to conclude that Henry's intent in touching K.C. was for the purpose of sexual arousal or gratification.

*B. Force or Threat of Force*

{¶26} The Revised Code defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). A victim "need not prove physical resistance to the offender" in order to demonstrate force. R.C. 2907.05(D). The Supreme Court of Ohio has addressed the issue of "force or threat of force" several times in the context of the rape statute, R.C. 2907.02. The Court stated that, under R.C. 2907.02, the amount of force necessary to commit the offense "depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge* (1988), 38 Ohio St.3d 56, paragraph one of the syllabus. Additionally, in *Eskridge,* the Court stated that force is present where the "victim's will [is] overcome by fear or duress * * * [.]" 38 Ohio St.3d at 59; see, also, *State v. Byrd*, 8th Dist. No. 82145, 2003-Ohio-3958, ¶26. The Supreme Court of Ohio has further clarified that "[a] defendant purposely compels another to submit to sexual conduct by force or

threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit. A threat of force can be inferred from the circumstances surrounding sexual conduct * * * [.]" *State v. Schaim*, 65 Ohio St.3d 51, 1992-Ohio-31, paragraph one of the syllabus.

{¶27} The Eighth Appellate District found that force or threat of force was absent where a fifteen year-old victim awoke in her bed to find an adult defendant touching her genitals over her clothing because he did not apply any force in relation to her body or clothing; because he did not hold a position of authority over her; because, as the victim became aware of the touching, she immediately got up and left the area; and, because the contact did not occur due to fear or duress. *Byrd*, supra.

{¶28} Additionally, the Eighth Appellate District found that force or threat of force was absent where an adult defendant asked a thirteen year-old victim to sit on his lap, put his hand up her skirt, touched her buttocks, and attempted to remove her underwear. The evidence showed that the victim did not sit on the defendant's lap due to fear or coercion; that the defendant did not say anything to the victim before or after she got up from his lap; and, that, as soon as he began touching her buttocks, she immediately jumped up and went to the phone to call her mother. Based upon this evidence, the court concluded that her will was not overcome and force was not present. *State v. Mitchell*, 8th Dist. No. 58447, 1991 WL 106037.

{¶29} In *State v. Euton*, 3d Dist. No. 2-06-35, 2007-Ohio-6704, this Court found that the force or threat of force element was absent in a similar situation. In *Euton*, this Court held that a defendant's act of slipping his hand under a blanket to touch a victim was insufficient evidence that the victim was compelled to submit by force or threat of force. This Court came to that conclusion because the defendant made no comments or threats to the victim; because the defendant did not apply any force in relation to the victim's body or clothing; because, as soon as the victim overcame the surprise of the touching, the victim jumped up and left the room; and, because there was no evidence that the defendant attempted to restrain the victim from getting up or leaving the room.

{¶30} Other districts have found that force or threat of force was not present in rape or gross sexual imposition convictions where an adult defendant removed a child victim's clothing and manipulated her body to facilitate sexual conduct and no parent-child relationship existed, *State v. Payton* (1997), 119 Ohio App.3d 694, abrogated on other grounds by *State v. Delmonico*, 11th Dist. No. 2003-A-0022, 2005-Ohio-2902; where a defendant rolled a child victim over to facilitate sexual conduct while the victim pretended to sleep, *State v. Edinger*, 10th Dist. No. 05AP-31, 2006-Ohio-1527; and, where the psychological force that was present when a victim was younger dissipated when she realized she could stop the sexual conduct because, at this point, her will was no longer overcome by fear or duress, *State v. Haschenburger*, 7th Dist. No. 05 MA 192, 2007-Ohio-1562.

**{¶31}** Here, Henry argues that there was insufficient evidence that he purposely compelled K.C. to engage in sexual contact through the use of force or threat of force. Based upon the preceding case law, we find that there was insufficient evidence that Henry compelled K.C. to submit by force or threat of force. Henry made no comments or threats to K.C.; there was no evidence that Henry applied force in relation to K.C.'s body or clothing; as soon as K.C. became aware of what was happening, she pushed Henry out of her bed, jumped out of bed, and left the room; and, there was no evidence that Henry attempted to restrain K.C. from getting up or leaving the room. Further, although evidence was presented that Henry was much larger in size than K.C., and that she was positioned between him and the wall, K.C. did not testify that she was restrained because of Henry's size or her position on the bed. In fact, to the contrary, K.C. testified that she was able to push Henry out of her bed on her first attempt "as soon as [she] wanted to" and leave the room immediately. Additionally, K.C. testified that she was repeatedly able to remove his hand from her shorts. Thus, the evidence elicited at trial demonstrates that K.C.'s will was not overcome by fear or duress. Accordingly, we cannot find that Henry's actions constituted the "violence, compulsion, or constraint" contemplated by R.C. 2901.01(A)(1) in comprising force or threat of force *sufficient to overcome the will of the victim.*

**{¶32}** We acknowledge, as the dissent sets forth, that the Eighth Appellate District has long held that, where a victim is sleeping at the outset of the sexual

conduct, the burden of evidence is satisfied with the minimal force required to manipulate the victim's clothing in order to facilitate sexual conduct. See *State v. Simpson*, 8th Dist. No. 88301, 2007-Ohio-4301; *State v. Lillard*, 8th Dist. No. 69242, 1996 WL 273781; *State v. Sullivan*, 8th Dist. No. 63818, 1993 WL 398551. However, even accepting for argument's sake the dissent's inference that Henry manipulated K.C.'s shorts, we would still find that this act did not constitute force. We find that the Eighth Appellate District's and the dissent's interpretation fails to recognize the requirement that force or threat of force must be sufficient to overcome the will of the victim, and blurs the distinction between sexual imposition and gross sexual imposition. As we stated in *Euton*, "[t]o find otherwise on these facts would render the distinction between sexual imposition and gross sexual imposition meaningless * * * and essentially allow any inappropriate touching to constitute gross sexual imposition, regardless of the use of force or a threat of force." 2007-Ohio-6704, at ¶42.

{¶33} Additionally, although the dissent claims that our majority rule allows a perpetrator to impose any sexual activity upon a sleeping victim without fear of being charged with any sexual offense requiring force or threat of force, we note that such a perpetrator may properly be charged with any number of offenses not requiring force, such as sexual battery in violation of R.C. 2907.03(A)(3) or sexual imposition in violation of R.C. 2907.06(A)(3). See, e.g., *State v. Lindsay*, 3d Dist. No. 8-06-24, 2007-Ohio-4490; *State v. Antoline*, 9th Dist. No.

02CA008100, 2003-Ohio-1130; *State v. Wright*, 9th Dist. No. 03CA0057-M, 2004-Ohio-603; *Byrd*, 2003-Ohio-3958, at ¶23 (finding that "perpetrators who engage in sexual conduct with another who is asleep or otherwise unable to appraise or control the nature of his or her conduct are typically prosecuted for sexual battery in violation of R.C. 2907.03(A)(2) or (3)"). Notably absent from the dissent is any discussion of Henry overcoming the will of the victim.

**{¶34}** For the preceding reasons, we find that reasonable minds could not conclude that Henry compelled K.C. to submit to sexual conduct by force or threat of force, and that the trial court erred in overruling Henry's Crim.R. 29 motion for acquittal.

**{¶35}** Accordingly, we sustain Henry's first assignment of error.

*Assignment of Error No. II*

**{¶36}** In his second assignment of error, Henry argues that his conviction for gross sexual imposition was against the manifest weight of the evidence. Specifically, Henry contends that his conviction was against the manifest weight because there was conflicting testimony as to when K.C. first claimed that he had touched her, and because the weight of the evidence demonstrated that Henry did not compel her to engage in sexual contact by force or threat of force.

**{¶37}** Our disposition of Henry's first assignment of error renders his second assignment of error moot, and we decline to address it. App.R. 12(A)(1)(c).

{¶38} Having found error prejudicial to the appellant herein, in the particulars assigned and argued in his first assignment of error, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**WILLAMOWSKI, J., concurs in Judgment Only.**


**SHAW, J., Dissents.**

{¶39} The defendant in this case, a large college wrestler, climbed into the bed of a petite, sleeping female college student (K.C.) who did not know him. K.C. was lying on her side with her back to the defendant. The bed was next to a wall so that the defendant effectively had K.C. positioned between himself and the wall.

{¶40} Upon blocking K.C. against the wall in this manner, the defendant made five separate attempts to reach over K.C. from behind and digitally penetrate her vagina. Five times K.C. was required to physically remove his hand from between her legs while telling him "no." Despite her resistance, the defendant successfully penetrated K.C. with his fingers three times out of the five attempts.

{¶41} The fifth time the defendant put his hands between her legs, K.C. suddenly became fully awake and realized it was a stranger and not her boyfriend. However, because of the defendant's position on the bed, effectively trapping her

between himself and the wall, K.C. then had to put her feet against the wall and with her back against the defendant, push him off the bed in order to escape from the bed and run downstairs.

{¶42} The majority has concluded these facts do not constitute sufficient force or threat of force to sustain a conviction for gross sexual imposition under R.C. 2907.05. Fortunately, having been concurred with in judgment only, the lead opinion sets no precedent or binding rule of law beyond the impact upon the parties in this case. Nevertheless, I am concerned that coupled with the similar recent decision of the majority in the *Euton* case, the decision in this case will be seen as promulgating a series of legal rulings from the Third District Court of Appeals regarding sexual offenses that, in my view, do not represent a proper interpretation of the factual circumstances or the applicable law governing these offenses.

{¶43} Foremost among the unfortunate conclusions likely to be drawn from our decision today is that a defendant who commits a non-consensual sexual offense may freely use whatever "persistence" is reasonably required to accomplish the act over moderate resistance of the victim without committing any "force or threat of force" under R.C. 2907.05 as a matter of law. Implicit in this ruling is the erroneous premise that in reviewing the weight or sufficiency of the evidence in any given case, the level of *resistance put up by the victim* is the primary indicator of the *force used by the defendant*.

{¶**44**} If removing a stranger's hand from between your legs and/or your vagina five separate times while saying "no' - and having to put your feet against a wall to gain sufficient leverage to remove yourself from the grasp of the perpetrator - is not sufficient for anyone to infer the use of force by the perpetrator, then the message from this decision and the *Euton* case, seems to be that whether the victim is a minor child or a college student, the burden is clearly upon the victim to demonstrate a significant level of physical resistance to any non-consensual sexual act imposed upon them against their will before the appellate court will consider the perpetrator's conduct to be "forceful." Thus, as long as any stranger can find a victim who is sleeping or is otherwise too young, terrified, startled or intimidated to risk the possibility of serious injury or death by providing enough resistance to provoke a major threat or act of additional violence, the stranger would seem to be relatively free under the majority interpretation of this case to impose any nonconsensual sexual act he chooses upon the victim, using whatever force is reasonably necessary to accomplish the act, without the possibility of being charged with any sexual offense involving the use of force.

{¶**45**} I also take issue with the apparent determination in today's decision that the amount of force the victim is required to use to escape from the grasp or restraint of the defendant somehow does not count as resistance to the sexual act itself and/or cannot be used to infer any force or threat of force on the part of the defendant in trying to complete the sexual act. And as noted earlier, I am

particularly concerned that these erroneous legal rulings and factual interpretations have already been applied by this majority to sexual offenses involving child victims. (See *State v. Euton*, 3rd Dist. No. 2-06-35, 2007-Ohio-6704, Preston, J. dissenting.)

**{¶46}** Because I believe that all of these determinations (and the decision in *State v. Euton*, supra) improperly disregard the reasonable inferences to be drawn from the facts in the record and/or are contrary to law, I respectfully dissent.

**{¶47}** Although both the lead opinion and the dissent discuss rulings on similar cases from other districts at some length, none of those rulings are really at issue here. On the contrary, as stated at the outset, the primary issue of concern to me is the determination of the majority that there was not sufficient evidence as to the element of "force or threat of force" before the trial court *in this case*.

**{¶48}** Force is defined as "*any* violence, compulsion, or constraint physically exerted by *any means* upon or against a person or thing." R.C. 2907.01(A)(1) (emphasis added). Moreover, we must be mindful that force need not be overt or physically brutal. *State v. Burton*, 4th Dist No. 05CA3, 2007-Ohio-1660 citing *State v. Eskridge* (1988), 38 Ohio St.3d 56, 59, 526 N.E.2d 304, and *State v. Milam,* 8th Dist No. 86268, 2006-Ohio-4742, at ¶ 9.

**{¶49}** In the present case, Henry began touching the victim when she was asleep. When other courts have addressed this type of conduct, they have noted

that "[w]hen the circumstances include a victim who is initially asleep when the sexual conduct begins, the state may satisfy its burden with evidence of only the minimal force required to manipulate the victim's body or clothing to facilitate the assault." *State v. Burton*, 2007-Ohio-1660 citing *State v. Lillard* (May 23, 1996), 8th Dist. No. 69242 (the victim awoke to find her covers removed and her robe and legs open) and *State v. Sullivan* (Oct. 7, 1993), 8th Dist. No. 63818 (the victim awoke to find her underwear pulled down and the defendant performing oral sex). See, also, *Milam* 2006-Ohio-4742 at ¶ 22; *State v. Graves,* 8th Dist. No. 88845, 2007-Ohio-5430 (the victim awoke to find her pants and underwear down and wet substance on her body); *State v. Simpson,* 8th Dist. No. 88301, 2007-Ohio-4301 at ¶ 50 (while the victim was asleep, the defendant manipulated her clothing and body to make her accessible for sex); *State v. Clark*, 8th Dist. No. 90148, 2008-Ohio-3358.

{¶50} The Eighth District Court of Appeals has repeatedly found that the insertion of the word "any" into the definition of "force," recognizes that different degrees and manners of force are used in various crimes with various victims. Where a victim was initially asleep, the force the defendant exerted under R.C. 2902.02(B) required only minimal physical exertion. *State v. Lillard*, 8th Dist. No. 69242 and *State v. Sullivan*, 8th Dist. No. 63818. In both *Lillard* and *Sullivan*, where the victim was asleep when the conduct began, the court found that the

conduct of separating a victim's legs and moving clothing was sufficient to satisfy the element of "force."

{¶51} Finally, although the majority relies on another case from the Eighth District Court of Appeals, *State v. Byrd*, 8th Dist. No. 82145, 2003-Ohio-3958, *Byrd* only confirms the holdings in *Lillard*, *Sullivan*, *Simpson*, *Clark*, and *Graves*.[1] In *Byrd*, the court found sufficient force where Byrd manipulated the victims clothing as part of the conduct. The *Byrd* Court only declined to find force with respect to a different victim, where Byrd only touched the girl over her clothing, a scenario factually distinguishable from the case at bar.

{¶52} In the present case, on August 12, 2008, K.C. had just moved into the CDH house. It was actually her first night sleeping in the new house and, although she was to have a roommate, her roommate had not yet moved in. K.C.

---

[1] We note that other than *Byrd*, the majority only relies on *State v. Euton*, 3rd Dist. No. 2-06-35, 2007-Ohio-6704. The majority, without analysis, argues that *Euton* is factually analogous to the case at bar. The victim in *Euton* was a fourteen year-old boy who resided with his father at the time of the incident. Apparently, both the victim and his father had met Euton only a few days prior. The facts of the incident are summarized as follows in *Euton*:

> **J.D. testified that a few minutes later, Euton, an intoxicated stranger, entered the dark room, crouched next to the mattress, fell over, reached under the blanket, and fondled J.D.'s penis on top of his cotton jogging pants. (*Id.* at 132-33, 152, 154-55). J.D. froze for a few moments, then turned to his older brother and said, "Kirk, he is touching me * * * what should I do?" (*Id.* at 133, 155, 158, 168). After a brief pause, Kirk replied, "just get up." (*Id.* at 158). Frightened and acting on his brother's advice, J.D. told Euton he needed to use the restroom, got up from the bed, and left the room. (*Id.* at 134, 157). Soon after, Michael, Annie's nephew, arrived at the house, and J.D. told him what happened. (*Id.* at 134-35).**

*State v. Euton*, 2007-Ohio-6704, at ¶53 Preston, J., concurring in part; dissenting in part. Despite the majority's opinion to the contrary, I find that these circumstances are not factually analogous to those in the case at bar. Moreover, I agree with the dissent in *Euton*, both for the reasons stated in the dissent and also for the reasons articulated in *Lillard*, *Sullivan*, *Simpson*, *Clark*, and *Graves*. The manipulation of the blanket covering the victim, in *Euton*, serves as its own indication of the exertion of force.

testified that her bed, in the CDH house, was upon a small platform, high enough that she actually had to push herself up to get into her bed. (Tr.p. 178).

{¶53} K.C. testified that she moved into the CDH house early, prior to the start of the school year and that when she moved in, other CDH residents were having a retreat. When K.C. came home from work on the night of August 12, 2006, she ate dinner and then got ready for bed. K.C. testified that she wore a sports bra and a pair of cotton shorts with an elastic waistband to bed that night. (Tr.p. 180).

{¶54} K.C. went to bed and was awakened by a person in bed behind her. She was laying on her right side facing the wall, and Henry was behind her on the bed. K.C. testified that she was woken up to the feeling of a hand down her shorts.

**A.      His, I was laying on my side and I like half awoke to feeling a hand down my parents like in my, my like pubic areas.**

**Q.      Was the hand on top of your shorts or underneath your shorts?**

**A.      They were underneath my shorts.**

**\*\*\***

**Q.      And you mentioned that the --- well, first of all, how close was this man to you in bed?**

**A.      He was right behind me.**

**Q.      How big did the man feel?**

**A.** He was bigger than me.

**Q.** What were you thinking when you were awakened and felt the man behind you touching your pubic area?

**A.** Well, when I first, it was like I half awoke and what my first thought was that it was my boyfriend at the time who I spent a lot of time with. I thought it was him, just kind of thinking, oh, it's Mike. He wants to kind of, you know, getting a little frisky or something.

**Q.** And you said pubic area before. Would you please describe what you mean by your pubic area?

**A.** Just like the outside of my private parts.

(Tr.p. 181-182).

{¶55} K.C. further testified that when she felt the hand down her shorts, she put her hand on his lower arm and removed his arm from her shorts. However, Henry tried again, putting his hand back down K.C.'s shorts, but this time "he went further in. He went to like the inside area of my private parts." (Tr.p. 183). When asked to describe what she meant, K.C. explained that "[l]ike he went, he went inside the lips of my pubic area." (Tr.p. 183). K.C. stated that when she removed Henry's hand from her shorts, she said "no." (Tr.p. 184).

{¶56} Henry again put his hand back down K.C.'s shorts "back down in like the vaginal area inside the lips." (Tr.p. 185). K.C. again removed Henry's hand from her shorts and said "no." (Id.). Henry again put his hand down K.C.'s shorts and K.C. testified that he "fully put his finger – he penetrated me." (Id.). Again, K.C. removed Henry's hand from her shorts and said "no." (Tr.p. 186).

When Henry put his hands down K.C.'s shorts again, she realized that the man behind her was not her boyfriend. (Tr.p. 187).

{¶57} After realizing that Henry was not her boyfriend K.C. stated that she "put my feet against the wall and kicked back and pushed the man off the bed behind me." (Tr.p. 187). After ejecting Henry from her bed K.C. ran downstairs for the living room. (Tr.p. 188). When K.C. returned to the bedroom, Henry was still there.

{¶58} Based on this testimony, I would find Henry's conviction was supported by sufficient evidence. First, based on the law as articulated by the Fourth and Eighth District Courts of Appeals, Henry's manipulation of K.C.'s shorts is sufficient to meet the definition of force. As the Ohio Supreme Court stated in *Eskridge*, force need not be overt or physically brutal.

{¶59} Second, even without relying on the manipulation of the clothing, I would find that there was sufficient evidence introduced to the element of force. Here, the victim was much smaller than Henry, described as very petite, while Henry was a larger wrestler. In addition, despite K.C.'s repeated attempts to stop Henry from touching her, he continued to try again each time she moved his hand away.

{¶60} Henry put K.C. in a situation where she was literally trapped between the wall and Henry. As a result, K.C. had to plan her feet against a wall and shove Henry to the floor with such force that a large thud was heard. The

degree of force necessary for K.C. to use to get away from Henry is further indication of the degree of force being used by Henry to perpetrate the offense. Thus, I would find that the evidence meets the traditional definition of force as articulated in R.C. 2907.01(A)(1). In the present case there was compulsion through Henry's repeated attempts. Moreover, based on Henry's physical placement of himself on the outside of the bed, trapping K.C. against the wall, there was physical compulsion. See R.C. 2907.01(A)(1).

{¶61} Finally, we must be mindful that the proper inquiry in this case is not whether we, members of the Court, would have found the element of "force" proven beyond a reasonable doubt; but rather, "whether, after viewing the evidence *in a light most favorable to the prosecution*, *any rational trier of fact could have*" concluded that "force" was present. (Emphasis added). *State v. Vires*, 3rd Dist. No. 2-07-16, 2007-Ohio-6015 at ¶12, citing *Jenks*, 61 Ohio St.2d 259 at paragraph two of the syllabus. Reviewing the evidence in a light most favorable to the prosecution, a rational trier of fact could readily have concluded that force was proven in this case.

{¶62} I would affirm Henry's conviction.